IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

**ROD WARREN, ERIC BOOKER,**  **PLAINTIFFS**
**BRYANT WELLS, and DION FOSTER**

v.    CASE NO: 3:22-CV-00130-BSM

**NUCOR CORPORATION,** *et al.*    **DEFENDANTS**

### ORDER

Nucor Corporation's motion for summary judgment [Doc. No. 37] is granted and plaintiffs' claims against all defendants are dismissed with prejudice.

### I. BACKGROUND

Rod Warren, Eric Booker, Bryant Wells, and Dion Foster are four black men who used to work at Nucor's steel plant in Blytheville, Arkansas (the "Plant"). They are suing Nucor and a number of its employees under the Arkansas Civil Rights Act ("ACRA") for race discrimination, creating a racially hostile work environment, and retaliation. Nucor is moving for summary judgment on all claims.

Warren began working for Nucor in 1994. Statement of Undisputed Material Facts ¶ 3, Doc. No. 38 ("SUMF"). During his long tenure at the Plant, Warren received mixed positive and negative feedback on performance reviews and occasional warnings for policy infractions. *See id.* ¶¶ 13–19, 22. In 2021, Nucor placed him on paid leave during an investigation of his alleged use of a racial slur and reinstated him after concluding that he had not done so. *Id.* ¶¶ 30–31. Warren was, however, required to sign a last chance agreement after he became irate and aggressive during an interview with management as part of that

investigation. *Id.* ¶¶ 28, 33. Specifically, Warren began by saying "it's always some BS" when asked if he knew what the interview was about. Deposition of Rod Warren 86:13–16, Doc. No. 38-1. He then used profane language to explain how angry he was. SUMF ¶ 28. Finally, he made threats against the employee whom he believed had reported him. *Id.*

The last chance agreement Nucor imposed on Warren provided for his termination if he failed to comply with Nucor's policies in the future. *Id.* ¶ 35. Warren filed an EEOC charge in relation to the last chance agreement in September 2021. Defs.' Mem. Mot. Dismiss Ex. 1, Doc. No. 8-1. In February 2022, Warren failed to perform certain job duties and then behaved in an insubordinate manner toward his supervisor when questioned about it, stating that he had "already told" the supervisor's boss about the incident and did not "need to tell you [sic] nothing." *Id.* ¶¶ 39–44, 46–56. He also used multiple instances of profanity in this interaction and said he would be calling his lawyer. Warren Dep. Ex. 16, Doc. No. 38-1. Nucor promptly fired Warren, citing poor work performance, insubordination, and aggressive and threatening behavior. SUMF ¶ 46.

Wells began working at the Plant in 2018. SUMF ¶ 70. In 2021, Nucor issued him first, second, and third-step warnings for violating attendance policies, and finally placed him on a last chance agreement. *Id.* ¶¶ 77, 79–81, 83. Wells alleges, as further discussed below, that white employees were not disciplined for similar attendance problems. Pls.' Resp. Mot. Summ. J. 9, Doc. No. 41. Early the next year, he shared a Nucor post advertising an upcoming job opening on his Facebook account with the comment: "Mf quitting left and

right heading to better opportunities. Y'all come on out and getcha some. Just have y'all a escape plan for when you tired of the BS." SUMF ¶ 84. Another Nucor employee told Wells's department manager about this post. *Id.* ¶ 85. The manager reached out to Wells to ask him about it. *Id.* After speaking to his manager, Wells made a Facebook post lambasting the "rat ass" who reported him, then, in response to another user's comment "[s]o somebody pu*sy?", Wells commented "big pu*sy." *Id.* ¶¶ 86–87. Nucor learned of these comments, decided they constituted threats and bullying against coworkers in violation of its social media policy, and fired Wells. *Id.* ¶¶ 88, 90.

Foster began working at the Plant in 2021. The following year, Nucor issued him first and second-step warnings for violating attendance policies. *Id.* ¶¶ 128, 131. In February 2022, Foster told his supervisor he was depressed and asked to take a personal day. *Id.* ¶ 133. The supervisor advised Foster that he could take a personal day if he had someone to cover for him or a sick day with a provider's note. *Id.* ¶ 134. Instead, Foster showed up to work for his scheduled February 8 shift, but spent most of it in the break room and was on his phone much of his shift the next day . *Id.* ¶ 132. As a result, Nucor issued Foster a third-step warning and suspension for work performance. *Id.* In December 2022, Nucor placed Foster on a last chance agreement, which provided for his termination if he failed to comply with Nucor's policies in the future. *Id.* ¶¶ 128, 131–32, 143–45. In March 2023, Foster and other coworkers left work twenty minutes early and failed to make shift relief as required by policy. *Id.* ¶ 148. Nucor fired Foster and imposed next-step discipline on the other

employees involved. *Id.* ¶¶ 147, 150.

Booker began working at the Plant in 2018. *Id.* ¶ 91. In 2020, Booker took a vacation day in the same way as his white coworkers but was singled out for discipline by his supervisor. Deposition of Eric Booker 25:2–18, 28:14–29:25, 35:4–25, Doc. No. 38-6. Nucor reassigned the supervisor after Booker complained to management about him. Booker Dep. 53:3–57:13. Booker received several warnings for attendance violations that apparently were expunged by 2021. SUMF ¶¶ 92–93. On April 6, 2021, Booker's white supervisor made an offensive remark to Booker about being his "slave driver," accompanied by a whip-cracking motion. SUMF ¶ 97; Booker Dep. 60:1–62:18. A few weeks later, Booker reported the incident to Plant management, which investigated the incident and fired the supervisor on May 3. *Id.* ¶¶ 96, 98–99; Booker Dep. 100:1–12. Nucor later issued Booker first and second-step warnings for attendance issues. *Id.* ¶¶ 101, 105. Booker filed an EEOC charge in January 2021, alleging that the discipline was discriminatory. *Id.* ¶ 94. Booker resigned in October 2022 after coming to believe that Plant management wanted him to leave and was "nitpicking" and "targeting" him by creating and enforcing rules. Booker Dep. 108:9–12, 91:19–93:2. Booker cited low morale and negative experiences with management as reasons for his resignation. Booker Dep. Ex. 12.

In addition to the incidents described above, Warren has produced evidence of a number of incidents, some of which occurred before the other three plaintiffs began working at the Plant, that he argues created a racially hostile work environment. In 2002, Warren

heard from his coworker, who was also black, that a white supervisor remarked after learning that his coworker had bought a home nearby, "Well, there goes the neighborhood." SUMF ¶ 59. Warren did not report this incident to Nucor. *Id.* In 2010, Warren and several coworkers circulated an email with a Maya Angelou poem that contained references to the KKK and racist acts such as lynching. SUMF ¶ 20. In response, Nucor placed Warren and the others on a three-day suspension. *Id.* Warren's coworker, with his approval, later published an article in a local newspaper criticizing the discipline and referencing three unidentified black employees who allegedly resigned because they believed they were mistreated or discriminated against. *Id.* ¶ 21.

In 2019 or 2020, a white Nucor employee posted a comment to the Facebook page of Warren's brother that referenced wearing KKK robes. *Id.* ¶ 60. Warren's brother showed him the comment, Warren reported it to his supervisor on a Monday, and Nucor completed its investigation that Friday and fired the employee the following week. *Id.*; Warren Dep. 150:15–19. Also in 2019 or 2020, Warren saw a white Nucor employee's Facebook video post about his new all-terrain vehicle in which a Confederate flag hanging in his garage was visible. SUMF ¶ 61. Warren did not report this incident to Nucor. *Id.* Sometime after May 2022, Warren saw a TikTok video by a white Nucor employee depicting him operating a forklift in a Nucor warehouse, with a caption stating, "When the hoes stop by the warehouse and find out your [sic] forklift certified." *Id.* ¶ 62.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Once the moving party demonstrates that there is no genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials in his pleadings. *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Instead, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute requiring a trial. *Id.* All reasonable inferences must be drawn in a light most favorable to the nonmoving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). The evidence is not weighed, and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008). "[S]ummary judgment is not disfavored and is designed for 'every action' . . . including [those] alleging discrimination . . . ." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

## III.  DISCUSSION

A.  <u>Abandoned Claims</u>

Booker has abandoned his race discrimination claim, and Foster and Wells have abandoned their retaliation claims. Pls.' Resp. Mot. Summ. J. 8, 28. Warren and Foster have abandoned efforts to establish the adverse employment action element of their race discrimination claims with actions other than termination. *Id.* at 4, 11–12. Wells has done

the same with respect to his denial of promotion. *Id.* at 9. Summary judgment is therefore granted as to these claims. *See Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020) ("failure to oppose a basis for summary judgment constitutes waiver of that argument") (citation omitted).

  B. <u>Race Discrimination</u>

Summary judgment is granted on plaintiffs' race discrimination claims. Plaintiffs' ACRA claims are analyzed in the same manner as federal Title VII claims. *Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023). Plaintiffs are seeking to establish a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework rather than offering direct evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–04 (1973). To establish a prima facie case, plaintiffs must show that (1) they are members of a protected group; (2) they were meeting the legitimate expectations of their employer; (3) they suffered adverse employment actions; and (4) the circumstances permit an inference of discrimination. *Moody v. Vozel*, 771 F.3d 1093, 1097 (8th Cir. 2014). An inference of discrimination may be established in a "variety of ways," most commonly by "showing more-favorable treatment of similarly-situated employees who are not in the protected class." *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 774 (8th Cir. 2016) (citation omitted). If plaintiffs make this threshold showing, the burden shifts to Nucor to provide a legitimate, non-discriminatory reason for its actions. *Id.* at 773. If Nucor articulates such a reason, plaintiffs may prevail only by proving that its justification is a pretext for discrimination. *Id.*

### *1. Rod Warren*

Summary judgment is granted on Warren's race discrimination claim because he has failed to establish a prima facie case of discrimination. The second element of his prima facie case—whether Warren was meeting Nucor's legitimate expectations—is in dispute. On the one hand, Warren remained employed by Nucor for 28 years, he received many positive reviews, and his basic skills to do his job are not in question. SUMF ¶¶ 3, 6; Pls.' Resp. Mot. Summ. J. 5; *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 470 (8th Cir. 2011) (plaintiff possessing the basic skills necessary to perform the job is sufficient to establish this element). On the other hand, Warren had a history of infractions, a frequently-identified "attitude" problem, and several major instances of behaving disrespectfully toward supervisors. SUMF ¶¶ 7–9, 13–19, 22, 28, 33, 41–44; *Robinson v. Am. Red Cross*, 753 F.3d 749, 755 (8th Cir. 2014) (plaintiff who received complaints for unprofessional behavior and hostility toward coworkers was not meeting her employer's legitimate expectations).

Even assuming Warren can establish that he met Nucor's legitimate expectations, summary judgment is appropriate because Warren has failed to establish the fourth element of his prima facie case. He attempts to do so by showing that similarly situated white employees were treated differently, which requires evidence that the white employees' misconduct was "of comparable seriousness" and that they were "similarly situated in all relevant respects." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 797 (8th Cir. 2011). Not only is insubordination a serious violation, but Warren was also on a last chance

agreement. *See Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("insubordination and violation of company policy are legitimate reasons for termination") (citation omitted). Warren has not identified any white Nucor employee also on a last chance agreement who committed misconduct of comparable seriousness and was disciplined more leniently. Therefore, he has failed to establish a prima facie case of discrimination.

### *2. Bryant Wells*

Summary judgment is granted on Wells's apparent claim that Nucor discriminated against him by giving him two warnings for not showing up for shifts on consecutive nights because he fails to establish his prima facie case. Am. Compl. ¶¶ 70–71, Doc. No. 13. Nucor's reasonable decision to impose separate discipline for policy violations on separate occasions is not an adverse employment action reviewable in federal court. *See Wagner v. Campbell*, 779 F.3d 761, 766–67 (8th Cir. 2015) ("not everything that makes an employee unhappy is an actionable adverse action") (citation omitted).

Summary judgment is granted on Wells's race discrimination claim with respect to his termination because he has failed to show that Nucor's reason for firing him was pretextual. Nucor appears to concede that Wells can meet his prima facie case and argues instead that he cannot establish pretext. Nucor states that it fired Wells because his Facebook activity constituted threats and bullying in violation of its policy. SUMF ¶ 88. Nucor was also concerned from reviewing Wells's posts that he was on the verge of quitting already and was mentally checked out, which was consistent with his poor attendance. *Id.* ¶ 89;

Deposition of Bryant Wells 143:14–144:15, Doc. No. 38-7. Wells argues that these reasons are pretextual because Nucor treated white employees whose posts violated its social media policy more leniently. Pls.' Resp. Mot. Summ. J. 11; *see Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 875 (8th Cir. 2010) (unequal application of disciplinary policy may establish pretext). He cites to white employees who posted: (1) a comment about wearing KKK robes, SUMF ¶ 60; (2) a video that showed a Confederate flag, *id.* ¶ 61; and (3) a video of the employee operating a forklift in a Nucor warehouse. *Id.* ¶ 62.

These examples do not prove that Nucor's reasons were pretextual. Nucor promptly fired the first employee after his post was brought to Nucor's attention. *Id.* ¶ 60; Warren Dep. 150:15–19. There is no evidence showing that the second employee's post was reported to Nucor or that he was on a last chance agreement. *Id.* at 170:7–15; Wells Dep. 153:24–155:4. Finally, while Wells has testified that the forklift video was reported to Nucor and that the employee who posted it was not disciplined (to his knowledge), he has presented no evidence that the employee was on a last chance agreement. Wells Dep. 153:14–23, 155:5–156:6. Without this showing, Wells cannot establish that the employee was similarly situated to him even if the forklift video constituted comparably serious misconduct. *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012) (requiring plaintiff to show at least one non-black employee who was "similarly situated in *all relevant respects*" to establish pretext through unequal treatment) (citation omitted) (emphasis added). Because there is no evidence that Nucor treated similarly situated white employees more leniently, Wells cannot

establish that his objectionable social media activity was not the real reason he was fired.

### 3. Dion Foster

Summary judgment is granted on Foster's race discrimination claim because he has failed to show that Nucor's proffered reason for firing him was pretextual. Foster may have made out a prima facie case of discrimination because (1) he is black; (2) no doubts have been raised about his competency at his job, *see Haigh*, 632 F.3d at 470 (possessing the basic skills necessary to perform the job is sufficient to establish the legitimate expectations element); (3) he was fired; and (4) evidence that at least one white employee (Anthony Rushing) was habitually late in violation of Nucor's attendance policy without being fired may support an inference of discrimination. Wells Dep. 151:13–152:16.

Foster has not, however, rebutted Nucor's legitimate, nondiscriminatory reason for his termination. As noted above, Nucor placed Foster on a last chance agreement after sequential discipline for absences and then fired him for leaving work early without making shift relief as required by policy. SUMF ¶¶ 128, 131–32, 143–45, 148. Foster characterizes this stated reason as pretextual given Nucor's leniency toward white employees who violated policy. Pls.' Resp. Mot. Summ. J. 15–16. To prove pretext by more favorable treatment of employees of a different race, however, Foster must meet the "rigorous" burden of demonstrating that those "employees were similarly situated in all relevant respects." *Gibson*, 670 F.3d at 855. Foster has not shown that any of the white employees were on a last chance agreement when they violated Nucor's attendance policies. Further, Nucor

imposed next-step discipline on three other employees who, like Foster, left early on March 2, 2023. *Id.* ¶ 150. One of these employees was white and another Hispanic. *Id.* Therefore, Foster fails to establish that Nucor's reason for firing him was pretextual.

    C.    <u>Hostile Work Environment</u>

Summary judgment is granted on plaintiffs' hostile work environment claims. To succeed on these claims, plaintiffs must show that (1) they are members of a protected group; (2) they were subjected to unwelcome harassment; (3) the harassment was because of their group membership; (4) the harassment affected a term, condition, or privilege of employment; and (5) their employer knew or should have known about the harassment and failed to respond in a prompt and effective manner. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518–19 (8th Cir. 2010).

Summary judgment is appropriate on Warren's hostile work environment claim because the conduct on which he bases this claim is either not sufficiently "severe or pervasive," *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010), or Nucor promptly and effectively responded to it. The standard for establishing harassment serious enough to support a Title VII or ACRA claim is demanding: "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Anderson*, 606 F.3d at 519 (citation omitted). Most of the conduct Warren identifies as harassing—an unreported twenty-year-old remark that he heard secondhand, an email he circulated himself, and

employee videos on social media fleetingly depicting a Confederate flag and using a derogatory term for women—is too "sporadic" and "isolated" to support a hostile work environment claim even if timely. *EEOC. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 687 (8th Cir. 2012); *cf. Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 944 (8th Cir. 2010) (finding that ongoing display of the Confederate flag at work by other employees could constitute harassment). Moreover, Nucor's investigation of allegations that Warren used a racial slur does not constitute harassment; Warren agrees that Nucor had a duty to investigate such allegations. Warren Dep. 142:17–143:7. Finally, with respect to the KKK comment on Facebook directed at Warren's brother, Nucor responded promptly and effectively once made aware of it by firing the responsible employee. Warren Dep. 150:15–19.

Summary judgment is appropriate on Booker's hostile work environment claim because Nucor promptly and effectively responded to the conduct on which he bases this claim. Nucor fired the white supervisor who made the slavery-related comment and gestures within a week of Booker reporting the incident. *See Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 994 (8th Cir. 2003) (company's discipline of harassing supervisor after completing investigation and within a week of learning of the incident precluded hostile work environment claim).

The hostile work environment claims of Wells and Foster are premised on the same conduct as Warren's claims. These claims would fail for the reasons his do even assuming Wells and Foster could bring them. *See Ellis v. Houston*, 742 F.3d 307, 320–21 (8th Cir.

2014) (holding that a plaintiff may bring a hostile work environment claim on offensive remarks to others that they became aware of).

D.     Retaliation

Summary judgment is granted on the retaliation claims brought by Warren and Booker because they cannot establish prima facie cases of retaliation. To do so, they would have to show that: (1) they engaged in protected conduct; (2) they suffered materially adverse employment actions; and (3) retaliation for the protected conduct is the "but for" cause of the adverse employment actions. *See Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013).

Summary judgment is appropriate on Warren's retaliation claim because he cannot show that retaliation was the reason for adverse employment actions against him. Nucor advised Warren at the beginning of a July 21, 2021 meeting that he would be placed on a last chance agreement. Warren Dep. 92:6–12, 95:16–96:7, Ex. 11. Later in that meeting, Warren questioned whether the discipline was motivated by racism, which he now characterizes as protected activity. *Id.* at 105:25–106:4; Pls.' Resp. Mot. Summ. J. 21–22. Nucor advising Warren that he would be placed on a last chance agreement could not have been retaliation for Warren's remarks because he did not make them until *after* Nucor advised Warren of the last chance agreement. Nor could it have been in retaliation for Warren filing the EEOC charge, since he did not file that charge until months later. Defs.' Mem. Mot. Dismiss Ex. A, Doc. No. 8-1. As to Warren's termination, it occurred on February 11, 2022, over five

months after the EEOC charge and nearly seven months after his complaint in the meeting. Generally, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation," *Anderson v. KAR Glob.*, 78 F.4th 1031, 1037 (8th Cir. 2023) (citation omitted), and "[t]he inference [of retaliation] vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011). No inference of causation can be drawn because Warren's protected activity occurred more than five months before he was fired.

Summary judgment is appropriate on Booker's retaliation claim because he did not suffer any materially adverse employment actions after engaging in protected activity. The first such protected activity was his filing of an EEOC charge on January 20, 2021. SUMF ¶ 94. The only discipline he received after that was two warnings for tardiness. *Id.* ¶¶ 101, 105; Booker Dep. 85:17–86:13. These were not materially adverse employment actions because while they could have led to Booker's termination had he continued to violate Nucor's policies, they did not themselves reduce his compensation or otherwise tangibly affect his employment. *See Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 943 (8th Cir. 2019) (warning that employee would be demoted if she continued to miss work was not materially adverse employment action).

E. Individual Defendants

Although the parties have not briefed this issue, summary judgment is also appropriate

on plaintiffs' claims against the individual defendants—Brad Campbell, Jay Henderson, Dave Reinhart, Greg Starnes, Kellie Crain, Chris Booker, Lou Incrocci, Keith Williams, and Troy Brooks. This is true because ACRA imposes liability only on employers, not individual employees. *See Carson v. Lacy*, 856 F. App'x 53, 54 (8th Cir. 2021) (citing cases); *Moss v. Texarkana Ark. Sch. Dist.*, 240 F. Supp. 3d 966, 982 (W.D. Ark. 2017).

## IV. CONCLUSION

For the foregoing reasons, Nucor's motion for summary judgment is granted and plaintiffs' claims against all defendants are dismissed with prejudice.

IT IS SO ORDERED this 26th day of December, 2023.

*[signature: Brian S. Miller]*
UNITED STATES DISTRICT JUDGE